BOEING CO. ET AL. *v.* UNITED STATES

No. 01–1209.   Argued December 9, 2002—Decided March 4, 2003*

*Together with No. 01–1382, *United States* v. *Boeing Sales Corp. et al.*, also on certiorari to the same court.

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 457.

*Kenneth S. Geller* argued the cause for petitioners in No. 01–1209 and respondents in No. 01–1382. With him on

the briefs were *Charles Rothfeld, David M. Gossett, Alan I. Horowitz, Joel V. Williamson, Wayne S. Kaplan, Roger J. Jones, Patricia Anne Yurchak, Marjorie M. Margolies,* and *John B. Magee.*

*Kent L. Jones* argued the cause for the United States in both cases. With him on the brief were *Solicitor General Olson, Assistant Attorney General O'Connor, Deputy Solicitor General Wallace, David English Carmack,* and *Frank P. Cihlar.*†

JUSTICE STEVENS delivered the opinion of the Court.

This suit concerns tax provisions enacted by Congress in 1971 to provide incentives for domestic manufacturers to increase their exports and in 1984 to limit and modify those incentives. The specific question presented involves the interpretation of a Treasury Regulation (26 CFR § 1.861–8(e)(3) (1979)) promulgated in 1977 that governs the accounting for research and development (R&D) expenses under both statutory schemes.[1] We shall explain the general outlines of the two statutes before we focus on that regulation.

The 1971 statute provided special tax treatment for export sales made by an American manufacturer through a subsidiary that qualified as a "domestic international sales corporation" (DISC).[2] The DISC itself is not a taxpayer; a portion of its income is deemed to have been distributed to its shareholders, and the shareholders must pay taxes on that portion,

---

†Briefs of *amici curiae* urging reversal were filed for Caterpillar, Inc., et al. by *C. David Swenson;* for the National Foreign Trade Council, Inc., by *Stephen D. Gardner;* and for the Tax Executives Institute, Inc., by *Fred F. Murray* and *Mary L. Fahey.*

[1] In 1996, the provisions of 26 CFR § 1.861–8 were amended, renumbered, and republished as 26 CFR § 1.861–17. See 26 CFR § 1.861–17 (2002); see also 60 Fed. Reg. 66503 (1995).

[2] To qualify as a DISC, at least 95 percent of a corporation's gross receipts must arise from qualified export receipts. See 26 U. S. C. § 992(a)(1)(A). In addition, at least 95 percent of the corporation's assets must be export related. See § 992(a)(1)(B).

but no tax is payable on the DISC's retained income until it is actually distributed. See 26 U. S. C. §§ 991–997. Typically, "a DISC is a wholly owned subsidiary of a U. S. corporation." 1 Senate Finance Committee, Deficit Reduction Act of 1984, 98th Cong., p. 630, n. 1 (Comm. Print 1984) (hereinafter Committee Print). The statute thus provides an incentive to maximize the DISC's share—and to minimize the parent's share—of the parties' aggregate income from export sales.

The DISC statute does not, however, allow the parent simply to assign all of the profits on its export sales to the DISC. Rather, "to avoid granting undue tax advantages,"[3] the statute provides three alternative ways in which the parties may divert a limited portion of taxable income from the parent to the DISC. See 26 U. S. C. §§ 994(a)(1)–(3). Each of the alternatives assumes that the parent has sold the product to the DISC at a hypothetical "transfer price" that produced a profit for both seller and buyer when the product was resold to the foreign customer. The alternative used by Boeing in this suit limited the DISC's taxable income to a little over half of the parties' "combined taxable income" (CTI).[4]

---

[3] S. Rep. No. 92–437, p. 13 (1971) (hereinafter S. Rep.).

[4] To be more precise, it allowed the DISC "to derive taxable income attributable to [an export sale] in an amount which does not exceed . . . 50 percent of the combined taxable income of [the DISC and the parent] plus 10 percent of the export promotion expenses of such DISC attributable to such receipts . . . ." 26 U. S. C. § 994(a)(2).

A hypothetical example in both the House and Senate Committee Reports illustrated the computation of a transfer price of $816 based on a DISC's selling price of $1,000 and the parent's cost of goods sold of $650. The gross margin of $350 was reduced by $180 (including the DISC's promotion expenses of $90, the parent's directly related selling and administrative expenses of $60, and the parent's prorated indirect expenses of $30), to produce a CTI of $170. Half of that amount ($85) plus 10 percent of the DISC's promotion expenses ($9) gave the DISC its allowable taxable income of $94, leaving only $76 of income immediately taxable to the parent. The $184 aggregate of the two amounts attributed to the DISC (promotion expenses of $90 plus its $94 share of CTI) subtracted from the

Soon after its enactment, the DISC statute became "the subject of an ongoing dispute between the United States and certain other signatories of the General Agreement on Tariffs and Trade (GATT)" regarding whether the DISC provisions were impermissible subsidies that violated our treaty obligations. Committee Print 634. "To remove the DISC as a contentious issue and to avoid further disputes over retaliation, the United States made a commitment to the GATT Council on October 1, 1982, to propose legislation that would address the concerns of other GATT members." *Id.*, at 634–635. This ultimately resulted in the replacement of the DISC provisions in 1984 with the "foreign sales corporation" (FSC) provisions of the Code. See Deficit Reduction Act of 1984, Pub. L. 98–369, §§ 801–805, 98 Stat. 985.[5]

Unlike a DISC, an FSC is a foreign corporation, and a portion of its income is taxable by the United States. See *ibid.;* see also B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders ¶ 17.14 (5th ed. 1987). Whereas a portion of a DISC's income was tax deferred, a portion of an FSC's income is exempted from taxation. Compare 26 U. S. C. §§ 991–997 with 26 U. S. C. §§ 921, 923 (1988 ed.). Hence, under the FSC regime, as under the DISC regime, it is in the parent's interest to maximize the FSC's share of the taxable income generated by export sales. Because the differences between the DISC and FSC regimes for the most part are immaterial to this suit, the analysis in this opinion will focus mainly on the DISC provisions.[6]

The Internal Revenue Code gives the taxpayer an election either to capitalize and amortize the costs of R&D over a period of years or to deduct such expenses currently. See

---

$1,000 gross receipt produced the "transfer price" of $816. See S. Rep., at 108, n. 7; H. R. Rep. No. 92–533, p. 74, n. 7 (1971) (hereinafter H. R. Rep.).

[5] In 2000, Congress repealed and replaced the FSC provisions with the "extraterritorial income" exclusion of 26 U. S. C. § 114.

[6] Two aspects of the 1984 statute that do have special significance to this suit are discussed in Part IV, *infra.*

26 U. S. C. § 174. The regulation at issue here, 26 CFR § 1.861–8(e)(3) (1979), deals with R&D expenditures for which the taxpayer has taken a current deduction. It tells the taxpaying parent and its DISC "what" must be treated as a cost when calculating CTI, and "how" those costs should be (a) allocated among different products and (b) apportioned between the DISC and its parent.[7]

With respect to the "what" question, the Treasury might have adopted a broad approach defining the relevant R&D as including all of the parent's products, or a narrow approach defining the relevant R&D as all R&D directly related to a particular product being exported. Instead, the regulation includes a list of two-digit Standard Industrial Classification (SIC) categories (examples are "chemicals and allied products" and "transportation equipment"), and it requires that R&D for any product within the same category as the exported product be taken into account.[8] See *ibid.* The regulation explains that R&D on any product "is an inherently speculative activity" that sometimes contributes unexpected benefits on other products, and "that the gross income derived from successful research and development must bear the cost of unsuccessful research and development." *Ibid.*

With respect to the two "how" questions, the regulations use gross receipts from sales as the basis both for allocating the costs among the products within the broad R&D categories and also for apportioning those costs between the parent and the DISC. Thus, if the exported product constitutes 20 percent of the parties' total sales of all products within an

---

[7] Treasury Regulation § 1.861–8 (1979) also specifies how other specific items of expense should be treated. See, *e. g.,* 26 CFR § 1.861–8(e)(2) (1979) (interest fees); § 1.861–8(e)(5) (legal and accounting fees); § 1.861–8(e)(6) (income taxes).

[8] The original regulation used two-digit SIC categories. See § 1.861–8(e)(3). The current regulation uses narrower three-digit SIC categories, see 26 CFR § 1.861–17(a)(2)(ii) (2002), but the change is not relevant to this suit.

R&D category, 20 percent of the R&D cost is allocated to that product. And if export sales represent 70 percent of the total sales of that product, 70 percent of that amount, or 14 percent of the R&D, is apportioned to the DISC.

## I

Petitioners (and cross-respondents) are The Boeing Company and subsidiaries that include a DISC and an FSC. For over 40 years Boeing has been a world leader in commercial aircraft development and a major exporter of commercial aircraft. During the period at issue in this litigation, the dollar volume of its sales amounted to about $64 billion, 67 percent of which were DISC-eligible export sales. The amount that Boeing spent on R&D during that period amounted to approximately $4.6 billion.

During the tax years at issue here, Boeing organized its internal operations along product lines (e. g., aircraft models 727, 737, 747, 757, 767) for management and accounting purposes, each of which constituted a separate "program" within the Boeing organization. For those purposes, it divided its R&D expenses into two broad categories: "Blue Sky" and "Company Sponsored Product Development." The former includes the cost of broad-based research aimed at generally advancing the state of aviation technology and developing alternative designs of new commercial planes. The latter includes product-specific research pertaining to a specific program after the board of directors has given its approval for the production of a new model. With respect to its $1 billion of "Blue Sky" R&D, Boeing's accounting was essentially consistent with 26 CFR § 1.861–8(e)(3) (1979).[9] Its

---

[9] Because all of Boeing's commercial aircraft were "transportation equipment" within the meaning of the Treasury Regulation, it properly allocated all of its Blue Sky research among all of its programs, and then apportioned those costs between the parent and the DISC. However, according to the Government, it erroneously did so on the basis of hours of direct labor rather than sales. See Brief for United States 10.

method of accounting for $3.6 billion of "Company Sponsored" R&D gave rise to this litigation.

Boeing's accountants treated all of the Company Sponsored research costs as directly related to a single program, and as totally unrelated to any other program. Thus, for DISC purposes, the cost of Company Sponsored R&D directly related to the 767 model, for example, had no effect on the calculation of the "combined taxable income" produced by export sales of any other models. Moreover, because immense Company Sponsored research costs were routinely incurred while a particular model was being completed and before any sales of that model occurred, those costs effectively "disappeared" in the calculation of the CTI even for the model to which the R&D was most directly related.[10] Almost half of the $3.6 billion of Company Sponsored R&D at issue in this suit was allocated to programs that had no sales in the year in which the research was conducted. That amount (approximately $1.75 billion) was deducted by Boeing currently in the calculation of its taxable income for the years at issue, but never affected the calculation of the CTI derived by Boeing and its DISC from export sales.

Pursuant to an audit, the Internal Revenue Service reallocated Boeing's Company Sponsored R&D costs for the years 1979 to 1987, thereby decreasing the untaxed profits of its export subsidiaries and increasing the parent's taxable profits from export sales. Boeing paid the additional tax obligation of $419 million and filed this suit seeking a refund. Relying on the decision of the Eighth Circuit in *St. Jude Medical, Inc.* v. *Commissioner*, 34 F. 3d 1394 (1994), the District Court entered summary judgment in favor of Boeing. It held that 26 CFR § 1.861–8(e)(3) (1979) is invalid as applied to DISC and FSC transactions because the regulation's cate-

---

[10] When Boeing charged R&D costs to programs that had no sales in the year the research was conducted, the R&D costs effectively "disappeared" in the sense that they were not accounted for by Boeing in computing its CTI.

gorical treatment of R&D conflicted with congressional intent that there be a "direct" relationship between items of gross income and expenses "related thereto," and with a specific DISC regulation giving the taxpayer the right to group and allocate income and costs by product or product line. The Court of Appeals for the Ninth Circuit reversed, 258 F. 3d 958 (2001), and we granted certiorari to resolve the conflict between the Circuits, 535 U. S. 1094 (2002). We now affirm.

## II

Section 861 of the Internal Revenue Code distinguishes between United States and foreign source income for several different purposes. See 26 U. S. C. § 861. The regulation at issue in this suit, 26 CFR § 1.861–8(e)(3) (1979), was promulgated pursuant to that general statute. Separate regulations promulgated under the DISC statute, 26 U. S. C. §§ 991–997, incorporate 26 CFR § 1.861–8(e)(3) (1979) by specific reference. See § 1.994–1(c)(6)(iii) (citing and incorporating the cost allocation rules of § 1.861–8). Boeing does not claim that its method of accounting for Company Sponsored R&D complied with § 1.861–8(e)(3). Rather, it argues that § 1.861–8(e)(3) is so plainly inconsistent with congressional intent and with other provisions of the DISC regulations that it cannot be validly applied to its computation of CTI for DISC purposes.

Boeing argues, in essence, that the statute and certain specific regulations promulgated pursuant to 26 U. S. C. § 994 give it an unqualified right to allocate its Company Sponsored R&D expenses to the specific products to which they are "factually related" and to exclude any allocated R&D from being treated as a cost of any other product. The relevant statutory text does not support its argument.

As we have already mentioned, the DISC statute gives the taxpayer a choice of three methods of determining the transfer price for an exported good. Boeing elected to use only the second method described in the following text:

"Inter-company pricing rules

"(a) In general

"In the case of a sale of export property to a DISC by a person described in section 482, the taxable income of such DISC and such person shall be based upon a transfer price which would allow such DISC to derive taxable income attributable to such sale (regardless of the sales price actually charged) in an amount *which does not exceed the greatest of—*

"(1) 4 percent of the qualified export receipts on the sale of such property by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts,

"(2) 50 percent of the *combined taxable income* of such DISC and such person which is *attributable* to the qualified export receipts on such property derived as the result of a sale by the DISC plus 10 percent of the export promotion expenses of such DISC attributable to such receipts, or

"(3) taxable income based upon the sale price actually charged (but subject to the rules provided in section 482).

"(b) Rules for commissions, rentals, and marginal costing

*"The Secretary shall prescribe regulations setting forth*

.        .        .        .        .

*"(2) rules for the allocation of expenditures in computing combined taxable income under subsection (a)(2)* in those cases where a DISC is seeking to establish or maintain a market for export property." 26 U. S. C. §§ 994(a)(1)–(3), (b)(2) (emphasis added).

The statute does not define the term "combined taxable income," nor does it specifically mention expenditures for R&D. Congress did grant the Secretary express authority to prescribe regulations for determining the proper alloca-

tion of expenditures in computing CTI in certain specific contexts. See, *e. g.*, §§ 994(b)(1)–(2). Yet in promulgating 26 CFR § 1.861–8 (1979), the Secretary of the Treasury exercised his rulemaking authority under 26 U. S. C. § 7805(a), which gives the Secretary general authority to "prescribe all needful rules and regulations for the enforcement" of the Internal Revenue Code. See 41 Fed. Reg. 49160 (1976) ("The proposed regulations are to be issued under the authority contained in section 7805 of the Internal Revenue Code"). Even if we regard the challenged regulation as interpretive because it was promulgated under § 7805(a)'s general rulemaking grant rather than pursuant to a specific grant of authority, we must still treat the regulation with deference. See *Cottage Savings Assn.* v. *Commissioner*, 499 U. S. 554, 560–561 (1991).

The words that we have emphasized in the statutory text do place some limits on the Secretary's interpretive authority. First, the "does not exceed" phrase places an upper limit on the share of the export profits that can be assigned to a DISC and also gives the taxpayer an unfettered right to select any of the three methods of setting a "transfer price." Second, the use of the term "combined taxable income" in subsection (a)(2) makes it clear that the taxable income of the domestic parent is a part of the equation that should produce the CTI. As Boeing recognizes, even a charitable contribution to the Seattle Symphony that reduces its domestic earnings from sales of 767's must be treated as a cost that is not definitely related to any particular category of income and thus must be apportioned among all categories of income, including income from export sales. See Brief for Petitioners in No. 01–1209, p. 8, n. 7. Third, the word "attributable" places a limit on the portion of the domestic parent's taxable income that can be treated as a part of the CTI. It is this word that provides the statutory basis for Boeing's position.

Under Boeing's reading of the statute, a calculation of the domestic income "attributable" to the export sale of a 767 may include both the direct and indirect costs of manufacturing and selling 767's, but it may not include the direct costs of selling anything else. Moreover, if Boeing's accountants classify a particular cost as directly related to the 767, that classification is conclusive. Thus, while the Secretary asserts that Boeing's R&D expenses are definitely related to all income in the relevant SIC category, Boeing claims the right to divide its R&D in a way that effectively creates three segments: (1) Blue Sky; (2) Company Sponsored R&D on products that have no sales in the current year; and (3) Company Sponsored R&D on products that are being sold currently. Boeing, like the Secretary, essentially treats Blue Sky R&D as an indirect cost in computing both its domestic taxable income and its CTI. With respect to the second segment, Boeing uses the R&D to reduce its domestic taxable earnings on every product it sells, but eliminates it entirely from the calculation of CTI on any product by charging the R&D costs to programs without any sales. The third segment is used for both domestic and CTI purposes, but with respect to CTI only for the export sales to which it is "factually related."

The Secretary's classification of all R&D as an indirect cost of all export sales of products in a broadly defined SIC category—in other words, as "attributable" to such sales—is surely not arbitrary. It has the virtue of providing consistent treatment for cost items used in computing the taxpayer's domestic taxable income and its CTI. Moreover, its allocation of R&D expenditures to all products in a category even when specifically intended to improve only one or a few of those products is no more tenuous than the allocation of a chief executive officer's salary to every product that a company sells even when he devotes virtually all of his time to the development of an Edsel.

On the other hand, even if Boeing's method of accounting for R&D is fully justified for management purposes, it certainly produces anomalies for tax purposes. Most obvious is the fact that it enabled Boeing to deduct some $1.75 billion of expenditures from its domestic taxable earnings under 26 U. S. C. § 174 and never deduct a penny of those expenditures from its "combined taxable earnings" under the DISC statute. See Brief for Petitioners in No. 01–1209, at 11. Less obvious, but nevertheless significant, is that Boeing's method assumed that Blue Sky research produces benefits for airplane models that are producing current income and—at the same time—assumed that Company Sponsored research related to a specific product, such as the 727, is not likely to produce benefits for other airplane models, such as the 737 or 767.[11]

In all events, the mere use of the word "attributable" in the text of § 994 surely does not qualify the Secretary's authority to decide whether a particular tax deductible expenditure made by the parent of a DISC is sufficiently related to its export sales to qualify as an indirect cost in the computation of the parties' CTI. Boeing argues, however, that the text of § 994 should be read in light of § 861, the more general provision dealing with the distinction between domestic and foreign source income.

Title 26 U. S. C. § 861(b) contains the following two sentences:

> "Taxable income from sources within United States
>
> "From the items of gross income specified in subsection (a) as being income from sources within the United States there shall be deducted the expenses, losses, and other deductions properly apportioned or allocated

---

[11] This assumption, of course, runs contrary to the Secretary's determination that R&D "is an inherently speculative activity" that sometimes contributes unexpected benefits on other products. 26 CFR § 1.861-8(e)(3)(i)(A) (1979).

thereto *and a ratable part* of any expenses, losses, or other deductions *which cannot definitely be allocated to some item or class of gross income.* The remainder, if any, shall be included in full as taxable income from sources within the United States." (Emphasis added.)

Focusing on the emphasized words, Boeing interprets this section as having created a background rule dividing all expenses into two categories: those that can be allocated to specific income and those that cannot. "Ratable" allocation is permissible for the second category, but not for the first, according to Boeing. Moreover, in Boeing's view, any expense in the first category cannot be ratably apportioned across all classes of income.

There are at least two flaws in this argument. First, although the emphasized words authorize ratable apportionment of costs that cannot definitely be allocated to some item or class of income, the sentence as a whole does not prohibit ratable apportionment of expenses that could be, but perhaps in fairness should not be, treated as direct costs. Second, the Secretary has the authority to prescribe regulations determining whether an expense can be properly apportioned to an item of gross income in the calculation of CTI. See 26 U. S. C. § 7805(a). Thus, as in this suit, if the Secretary reasonably determines that Company Sponsored R&D can be properly apportioned on a categorical basis, the italicized portion of § 861 is simply inapplicable.

In sum, Boeing's arguments based on statutory text are plainly insufficient to overcome the deference to which the Secretary's interpretation is entitled.

## III

Boeing also advances two arguments based on the text of specific DISC regulations. The first resembles its argument based on the text of § 861, and the second relies on regulations providing that certain accounting decisions made by the taxpayer shall be controlling.

The regulations included in 26 CFR § 1.994–1 (1979) set forth intercompany pricing rules for DISCs. They generally describe the three methods of determining a transfer price, noting that the taxpayer may choose the most favorable method, and may group transactions to use one method for some export sales and another method for others. See *ibid.* With respect to the CTI method used by Boeing, there is a rule, § 1.994–1(c)(6), that describes the computation of CTI. The rule broadly defines the CTI of a DISC and its related supplier from a sale of export property as the excess of gross receipts over their total costs "which relate to such gross receipts."[12] Subdivision (iii) of that rule, on which Boeing relies, provides:

> "Costs (other than cost of goods sold) which shall be treated as relating to gross receipts from sales of export property are *(a)* the expenses, losses, and other deductions *definitely related,* and therefore allocated and ap-

---

[12] Treasury Regulation § 1.994–1(c)(6), 26 CFR § 1.994–1(c)(6) (1979), provides in part:

*"Combined taxable income.* For purposes of this section, the combined taxable income of a DISC and its related supplier from a sale of export property is the excess of the gross receipts (as defined in section 993(f)) of the DISC from such sale over the total costs of the DISC and related supplier which relate to such gross receipts. Gross receipts from a sale do not include interest with respect to the sale. Combined taxable income under this paragraph shall be determined after taking into account under paragraph (e)(2) of this section all adjustments required by section 482 with respect to transactions to which such section is applicable. In determining the gross receipts of the DISC and the total costs of the DISC and related supplier which relate to such gross receipts, the following rules shall be applied:

"(i) Subject to subdivisions (ii) through (v) of this subparagraph, the taxpayer's method of accounting used in computing taxable income will be accepted for purposes of determining amounts and the taxable year for which items of income and expense (including depreciation) are taken into account. See § 1.991–1(b)(2) with respect to the method of accounting which may be used by a DISC."

portioned, thereto, and *(b)* a ratable part of any other expenses, losses, or other deductions *which are not definitely related to a class of gross income*, determined in a manner consistent with the rules set forth in § 1.861–8." § 1.994–1(c)(6)(iii) (emphasis added).

Boeing interprets the emphasized words as prohibiting a ratable allocation of R&D expenditures that can be "definitely related" to particular export sales. The obvious response to this argument is provided by the final words in the paragraph. Whether such an expense can be "definitely related" is determined by the rules set forth in the very regulation that Boeing challenges, § 1.861–8. Moreover, it seems quite clear that the Secretary could reasonably determine that expenditures on 767 research conducted in years before any 767's were sold were not "definitely related" to any sales, but should be treated as an indirect cost of producing the gross income derived from the sale of all planes in the transportation equipment category.

Boeing also argues that the regulations expressly allow it to allocate and apportion R&D expenses to groups of export sales that are based on industry usage rather than SIC categories. The regulations providing the strongest support for this argument are §§ 1.994–1(c)(7)(i) and (ii)(a), which control the grouping of transactions for the purpose of determining the transfer price of sales of export property, and § 1.994–1(c)(6)(iv), which governs the grouping of receipts when the CTI method of transfer pricing is used.[13] Treasury Regulation § 1.994–1(c)(7) reads, in part, as follows:

---

[13] In support of its argument that §§ 1.994–1(c) and 1.861–8(e)(3) conflict, Boeing also points to various proposed regulations, including example 1 of proposed regulation § 1.861–8(g). See Brief for Petitioners in No. 01–1209, pp. 22–26. Unlike Boeing and the dissent, see *post*, at 458–459 (opinion of THOMAS, J.), we find these proposed regulations to be of little consequence given that they were nothing more than mere proposals. In 1972—when regulations governing DISCs were first proposed—the Secre-

*"Grouping transactions.* (i) Generally, the determinations under this section are to be made on a transaction-by-transaction basis. However, at the annual choice of the taxpayer some or all of these determinations may be made on the basis of groups consisting of products or product lines.

"(ii) A determination by a taxpayer as to a product or a product line will be accepted by a district director if such determination conforms to any one of the following standards: *(a)* A recognized industry or trade usage, or *(b)* the 2-digit major groups . . . of the Standard Industrial Classification . . . ."

As we understand the statutory and regulatory scheme, it gives controlling effect to three important choices by the taxpayer. First, the taxpayer may elect to deduct R&D expenses on an annual basis instead of capitalizing and amortizing those costs. See 26 U. S. C. § 174(a)(1). Second, when engaging in export transactions with a DISC, the taxpayer may choose any one of the three methods of determining the transfer price. See § 994(a). Third, the taxpayer may decide how best to group those transactions for purposes of applying the transfer pricing methods. See 26 CFR § 1.994–1(c)(7) (1979). Conceivably, the taxpayer could account for each sale separately, by product lines, or by grouping all of its export sales together. These regulations confirm the finality of the third type of choice (*i. e.*, which groups of sales will be evaluated under one of the three alternative transfer pricing methods), but do not speak to the questions answered by the regulation at issue in this suit—namely, whether or

tary made clear that the proposed regulations were suggestions only and that whatever final regulations were ultimately adopted would govern. See Technical Memorandum accompanying Notice of Proposed Rulemaking, 1972 T. M. Lexis 14, pp. *8–*9 (June 29, 1972) (providing that in determining deductible expenses, "the rules of section 861(b) and § 1.861–8 are to be applied in whatever form they ultimately take in a new notice to be prepared").

how a particular research cost should be allocated and apportioned.

Nor does § 1.994–1(c)(6)(iv) support Boeing's argument. It provides that a "taxpayer's choice in accordance with subparagraph (7) of this paragraph as to the grouping of transactions shall be controlling, and costs deductible in a taxable year shall be allocated and apportioned to the items or classes of gross income of such taxable year resulting from such grouping." The regulation makes clear that if the taxpayer selects the CTI method of transfer pricing (as Boeing did), then the taxpayer may choose to group export receipts according to product lines, two-digit SIC codes, or on a transaction-by-transaction basis. *Ibid.* The regulation also establishes that there shall be an allocation and apportionment of all relevant costs deducted in the taxable year. *Ibid.* Notably, however, the regulation simply does not speak to how costs should be allocated among different items or classes of gross income and apportioned between the DISC and its parent once the taxpayer (pursuant to § 1.994–1(c)(6)) groups its gross receipts. Treasury Regulation § 1.861–8(e)(3) fills this gap by providing that R&D expenditures that are related to all income reasonably connected with the taxpayer's relevant two-digit SIC category or categories are "*allocable to all items of gross income as a class . . .* related to such product category (or categories)." 26 CFR § 1.861–8(e)(3) (1979) (emphasis added).

## IV

Boeing also relies heavily on legislative history, particularly on statements in Reports prepared by the tax-writing committees of the House and the Senate on the DISC statute. Those Reports are virtually identical in terms of their discussion of the DISC provisions. See H. R. Rep., at 58–95; S. Rep., at 90–129. Neither says anything about R&D costs. They both contain statements supporting the proposition that in determining how to calculate income that qualifies

for a tax benefit, the expenses to be deducted from gross income are those expenses that are "directly related" to the income. See H. R. Rep., at 74; S. Rep., at 107. Those statements are not, however, inconsistent with the proposition that particular R&D expenses may be factually related to more than one item of income, or with the proposition that the Secretary has broad authority to promulgate regulations determining which expenses are directly or indirectly related to particular items of income.

If anything, what little relevant legislative history there is in this suit weighs in favor of the Government's position in two important respects. First, whereas the DISC transfer price could be set at a level that attributed over half of the CTI to the DISC, when Congress enacted the FSC provisions in 1984, it lowered the maximum allowable share of CTI attributable to an FSC to 23 percent. Compare 26 U. S. C. § 994(a)(2) with 26 U. S. C. § 925(a)(2) (1988 ed.). This dramatizes the point that even though the purpose of the DISC and FSC statutes was to provide American firms with a tax incentive to increase their exports, Congress did not intend to grant "undue tax advantages" to firms. S. Rep., at 13. Rather, the statutory formulas were designed to place ceilings on the amount of those special tax benefits. See Committee Print 636 ("[T]he income of the foreign sales corporation must be determined according to transfer prices specified in the bill: either actual prices for sales between unrelated, independent parties or, if the sales are between related parties, formula prices which are intended to comply with GATT's requirement of arm's-length prices").

Second, the 1977 R&D regulation at issue in this suit had been in effect for seven years when Congress enacted the FSC provisions. Yet Congress did not legislatively override 26 CFR § 1.861–8(e)(3) (1979) in enacting the FSC provisions. In fact, although a moratorium was placed on the application of § 1.861–8(e)(3) for purposes of the sourcing of income in

1981,[14] a 1984 conference agreement specified that the moratorium would "not apply for other purposes, such as the computation of combined taxable income of a DISC (or FSC) and its related supplier." H. R. Conf. Rep. No. 98–861, p. 1263 (1984). The fact that Congress did not legislatively override 26 CFR § 1.861–8(e)(3) (1979) in enacting the FSC provisions in 1984 serves as persuasive evidence that Congress regarded that regulation as a correct implementation of its intent. See *Lorillard* v. *Pons*, 434 U. S. 575, 580–581 (1978).

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, dissenting.

Before placing its hand in the taxpayer's pocket, the Government must place its finger on the law authorizing its action. *United Dominion Industries, Inc.* v. *United States*, 532 U. S. 822, 839 (2001) (THOMAS, J., concurring) (citing *Leavell* v. *Blades*, 237 Mo. 695, 700–701, 141 S. W. 893, 894 (1911)). Despite the Government's failure to do so here, the Court holds in its favor; I respectfully dissent.

To read the majority opinion, one would think that the Court has before it a perfectly clear statutory and regulatory scheme and that the position of petitioners/cross-respondents (hereinafter Boeing) is utterly without support. Nothing could be further from the facts of this suit. Indeed, the Internal Revenue Service (IRS) itself initially read the statu-

---

[14] In 1981, Congress imposed a temporary moratorium on the application of the cost allocation rules of 26 CFR § 1.861–8(e)(3) (1979) solely for the geographic sourcing of income. See Economic Recovery Tax Act of 1981, Pub. L. 97–34, § 223, 95 Stat. 249. As a result, research expenditures made for research conducted in the United States were allocated against United States source gross income only—not between United States source income and foreign source income. See H. R. Conf. Rep. No. 98–861, p. 1262 (1984).

tory and regulatory provisions at issue here to permit precisely what Boeing asserts it is allowed to do.[1]

When regulations governing DISCs were first proposed in 1972, the IRS received public comments recommending that the regulations be amplified to include rules and examples on how expenses should be treated for purposes of determining the combined taxable income of the DISC and a related supplier. The IRS, however, declined to incorporate the recommendations in the final regulations, explaining that proposed regulation § 1.861–8, which had been published in 1973, provided ample guidance on the subject. Technical Memorandum accompanying T. D. 7364, 1974 T. M. Lexis 30, pp. *20–*21 (Oct. 29, 1974).

Proposed regulation § 1.861–8(e)(3), in turn, explained that where "research and development . . . is intended or is reasonably expected to result in the improvement of specific properties or processes, deductions in connection with such research and development shall be considered definitely related and therefore allocable to the class of gross income to which the properties or processes give rise or are reasonably *expected* to give rise." 38 Fed. Reg. 15843 (1973). The regulations went on to note that in "other cases, as in the case of most basic research, research and development shall generally be considered definitely related and therefore allocable to all gross income of the current taxable year which is likely to benefit from the research and development." *Ibid.* Example 1 in § 1.861–8(g) illustrated this principle by considering the research and development (R&D) expenditures of a corporation manufacturing four-, six-, and eight-cylinder gasoline engines. The corporation conducted both general and engine-specific research. The example made clear that,

---

[1] Because, as the Court notes, *ante,* at 442, differences in the rules governing domestic international sales corporations (DISCs) and foreign sales corporations do not affect the outcome of this suit, I too focus only on the relevant DISC provisions.

while general R&D expenses were "definitely related" to gross income resulting from sales of all three types of engines, R&D expenses in connection with a specific type of engine were to be allocated only to gross income arising from sales of that type of engine. *Id.*, at 15846 ("X's deductions for its research and development expenses in connection with the 4 cylinder engine are definitely related to the gross income to which the 4 cylinder engine gives rise, *i. e.*, gross income from the sales of 4 cylinder engines . . .").

Indeed, the IRS' 1974 position on the proper allocation of R&D expenses incurred in connection with separate lines of products is the only one that makes sense under the relevant DISC regulations. See, *e. g.*, 26 CFR §§ 1.994–1(c)(6), (7) (1979). As the Court explains, *ante*, at 440, 26 U. S. C. § 994 was designed to provide special tax treatment for American companies engaged in export activities. To that end, § 994 permits a DISC and its related supplier to compute their relevant transfer price (and, relatedly, their income tax liability) based on one of three methods. See § 994 (providing that the transfer price for sales between a DISC and a related supplier can be computed based on (1) the gross income method, (2) the combined taxable income method, and (3) the usual transfer-pricing rules set forth in § 482).

The Treasury Department has promulgated regulations explaining how the statutory framework must be applied. Section 1.994–1(c)(7) of those regulations explains that, as a general rule, a determination of the transfer price under § 994 is to be made on a transaction-by-transaction basis. Section 1.994–1(c)(7), however, provides that, instead of following the transaction-by-transaction rule, taxpayers may make § 994 transfer price determinations based on groups consisting of products or product lines. § 1.994–1(c)(7)(i). Specifically, the regulation states:

> "A determination by a taxpayer as to a product or a product line will be accepted by a district director if

such determination conforms to any one of the following standards: *(a)* A recognized industry or trade usage, or *(b)* the 2-digit major groups (or any inferior classifications or combinations thereof, within a major group) of the Standard Industrial Classification [SIC] as prepared by the [Office of Management and Budget]." § 1.994–1(c)(7)(ii).

Section 1.994–1(c)(6)(iv), in turn, provides that, in connection with the computation of combined taxable income, "[t]he taxpayer's choice in accordance with [§ 1.994–1(c)(7)] as to the grouping of transactions shall be controlling, and *costs deductible in a taxable year shall be allocated and apportioned to the items or classes of gross income of such taxable year resulting from such grouping.*" (Emphasis added.) Thus, in tandem, §§ 1.994–1(c)(6)(iv) and 1.994–1(c)(7) give a taxpayer the choice of allocating and apportioning costs to items or classes of gross income resulting from (1) case-by-case transactions, (2) products or product lines grouped together based on industry or trade usage, and (3) products or product lines grouped together based on 2-digit SIC codes or lesser included subgroups.

Although under § 1.991–1(c)(7) taxpayers are given three choices with respect to the proper grouping of export income (*and* the related allocation of *expenses*), and although § 1.994–1(c)(6)(iv) provides that the taxpayer's selection under § 1.991–1(c)(7) shall be "controlling," § 1.861–8(e)(3) takes away the very choices § 1.991–1 provides. Under § 1.861–8(e)(3), the taxpayer is told that R&D expenses may be allocated *solely* to items or classes of gross income resulting from products that are within the same 2-digit SIC group—which happens to be only one of the three options given under § 1.991–1(c)(7). In my view, the rule set forth in § 1.861–8(e)(3) entirely eviscerates the options given in § 1.991–1. Thus, despite the Court's efforts to show that the two regulations complement, rather than contradict, each

other, *ante,* at 453–455, the conflict is irreconcilable.[2]  On these facts, a taxpayer should be permitted to compute its tax liability under § 1.991–1, rather than under § 1.861–8(e)(3), based on the principle that a specific rule governs a general one.[3]  See *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374, 384 (1992); *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.,* 482 U. S. 437, 445 (1987); see also *St. Jude Medical, Inc.* v. *Commissioner,* 34 F. 3d 1394 (CA8 1994).

The Court disapproves of Boeing's method of allocating R&D because, as the Court sees it, Boeing's approach results in the "disappear[ance]" of relevant costs, *ante,* at 445, in "the sense that [R&D costs] were not accounted for by Boeing in computing its [combined taxable income]," *ante,* at 445, n. 10.  The Court is troubled by the fact that this computation method has enabled Boeing "to deduct some $1.75 billion of expenditures from its domestic taxable earnings under 26 U. S. C. § 174 and never deduct a penny of those expenditures from its 'combined taxable earnings' under the DISC statute."  *Ante,* at 450.  But the "disappearance" of Boeing's R&D expenses is the direct result of Congress' decision to encourage such expenditures by making them immediately deductible under 26 U. S. C. § 174(a)(1).  Moreover, the approach adopted in the regulations, and approved by the Court, does not remedy the alleged problem of disappearing

---

[2] A taxpayer wishing to (1) group its sales based on an accepted industry practice, for example, based on different models, *and* (2) allocate its R&D expenses with respect to a specific model to the items or classes of gross income resulting from that model is not, on the Government's view, permitted to do so.  Rather, the taxpayer must first allocate R&D expenses incurred in connection with the relevant model to items or classes of gross income resulting from all models falling within the same 2-digit SIC group and only after doing so can the taxpayer deduct a portion of that model's R&D expenses from the income earned by sales of that model.

[3] With respect to a DISC, § 1.991–1 provides the more specific rules because it applies only to DISCs, while § 1.861–8(e)(3) sets forth more general rules because it applies to all taxpayers that have foreign source income.

R&D expenses. A company that decides to enter the export market with a product unrelated to its existing business remains free to deduct in the current tax period all R&D expenses incurred in connection with the new product, even though those expenses would not be used to offset DISC income resulting from the sale of existing products.[4] Finally, neither the Court nor the Government provides a satisfactory explanation for why § 861 can be read to permit the "disappearance" of most expenses, see, e. g., 26 CFR § 1.861-8(d)(1) (1979) ("Each deduction which bears a definite relationship to a class of gross income shall be allocated to that class . . . even though, for the taxable year, no gross income in such class is received or accrued . . . . In apportioning deductions, it may be that, for the taxable year, there is no gross income in the statutory grouping (or residual grouping), or that deductions exceed the amount of gross income in the statutory grouping (or residual grouping)"); see also 1 J. Isenbergh, International Taxation: U. S. Taxation of Foreign Persons and Foreign Income ¶ 21.10 (3d ed. 2003) ("[I]f an expense incurred in one year is properly allocable to income arising in another, the expense will be allocated to the class to which the income belongs and may therefore produce a loss in that class for the year"), but to disallow the "disappearance" of R&D expenses.

---

[4] Boeing illustrates this point with the following example: Suppose a company that produces and exports athletic clothing (SIC Code 23) decides to invest the proceeds of its clothing sales in research to develop a line of athletic equipment (SIC Code 39). The company has current DISC sales of $1 million from the athletic clothing, no current sales of athletic equipment, and $500,000 in athletic equipment R&D expenses. Under the regulations, the $500,000 of equipment-related R&D will be allocated to the athletic equipment SIC Code, which has no income. It will not be allocated to the athletic clothing SIC Code to reduce the income eligible for the DISC benefit related to the clothing. Thus, in the words of the Court, the expense will simply "disappear." Brief for Petitioners in No. 01–1209, p. 37, n. 17.

Because I believe that § 1.861–8(e)(3) does not apply to a DISC, I need not decide here whether § 1.861–8(e)(3) is consistent with the text of § 861(b) and may be properly applied in other contexts. I am puzzled, however, by the Court's assertion that the Secretary is free to determine that certain expenses "can be properly apportioned on a categorical basis," *ante*, at 451, and the implication that the Secretary has authority to require "ratable apportionment of expenses that could be, but perhaps in fairness should not be, treated as direct costs." *Ibid.* By its terms, § 861(b) appears to contemplate two types of expenses: (1) those that can definitely be allocated to some item or class of gross income and (2) those that *cannot.* 26 U. S. C. § 861(b) (providing for the deduction of "*the* expenses, losses, and other deductions properly apportioned or allocated thereto *and a ratable part* of any expenses, losses, or other deductions *which cannot definitely be allocated to some item or class of gross income*" (emphasis added)). Moreover, on its face, the statute does not appear to permit expenses to be "deemed" related to an item or class of gross income, even though in actual fact they are not so related. Yet, § 1.861–8(e)(3) relies on the notion of "deemed relationships." The regulation states that the methods of allocation and apportionment established there "recognize that research and development is an inherently speculative activity, that findings may contribute unexpected benefits, and that the gross income derived from successful research and development must bear the cost of unsuccessful research and development." 26 CFR § 1.861–8(e)(3)(i)(A) (1979). The regulation then proceeds to require the allocation of R&D expenses based on 2-digit SIC groups. But neither the regulation nor the Court attempt to reconcile the statutory text with the regulation's determination to allocate certain R&D expenses to items or classes of gross income that admittedly did not benefit from that research.

* * *

In short, I conclude that Boeing properly computed its tax liability for the years at issue here. I would therefore reverse the judgment of the Court of Appeals. Because the Court concludes otherwise, I respectfully dissent.