# United States Court of Appeals for the Federal Circuit

---

**FORD MOTOR COMPANY,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2017-2360

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00458-CFL, Judge Charles F. Lettow.

---

Decided: November 9, 2018

---

JESSICA LYNN ELLSWORTH, Hogan Lovells US LLP, Washington, DC, argued for plaintiff-appellant. Also represented by EUGENE ALEXIS SOKOLOFF, KATHERINE BOOTH WELLINGTON; ROBERT E. KOLEK, Schiff Hardin LLP, Chicago, IL.

RICHARD CALDARONE, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by DAVID A. HUBBERT, FRANCESCA UGOLINI.

---

Before MOORE, WALLACH, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

Ford Motor Co. sued the United States in the Court of Federal Claims to recover interest payments that it alleges the government owes on Ford's past tax overpayments. Ford can only recover this interest if it and its Foreign Sales Corporation subsidiary were the "same taxpayer" under 26 U.S.C. § 6621(d) when Ford made its overpayment and the subsidiary made equal tax underpayments. The Court of Federal Claims granted summary judgment for the government after concluding that Ford and its subsidiary were not the same taxpayer. For the reasons below, we affirm.

I

This case concerns the interplay between two statutory tax schemes, the "interest netting" provision of 26 U.S.C. (I.R.C.) § 6621(d) and the Foreign Sales Corporation statute that incentivized U.S. company exports between 1984 and 2000. We begin with a brief explanation of the purposes and structures of these schemes.

A

In general, a taxpayer who fails to fully pay taxes it owes to the government before the last date prescribed for payment will owe the government interest based on the duration and amount of the underpayment. I.R.C. § 6601(a). Relatedly, taxpayers who overpay their taxes are often entitled to receive interest payments from the government based on the duration and amount of their overpayment. *Id.* at § 6611. In both cases, the interest rates used to calculate the amount of interest owed are set by I.R.C. § 6621(a)–(c).

Since 1986, most corporate taxpayers have faced different interest rates for overpayments and underpayments. Interest accrues at a higher rate on corporate

taxpayers' underpayments than on their overpayments. *Id.* This rate discrepancy meant that a corporate taxpayer with equal underpayments and overpayments could be liable to the Internal Revenue Service for owed interest, even though, overall, it had paid the IRS the full amount of tax owed. Because the taxpayer's underpayment would accrue more interest than its overpayment during the same period, the taxpayer would be liable to the IRS for the difference in interest that accrued on the two equal sums.

In 1996, Congress addressed this scenario by enacting I.R.C. § 6621(d) as part of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, § 3301(a), 112 Stat. 741. Section 6621(d) provides:

> To the extent that, for any period, interest is payable under subchapter A and allowable under subchapter B on equivalent underpayments and overpayments by the same taxpayer of tax imposed by this title, the net rate of interest under this section on such amounts shall be zero for such period.

Put simply, this "interest netting" provision cancels out any interest accrual on overlapping underpayments and overpayments. By either decreasing the interest rate for an underpayment or increasing the interest rate for an overpayment, the IRS "nets" the two rates to ensure that the taxpayer's interest liability is zero. But this interest netting option is available only if the overlapping underpayments and overpayments were made by the same taxpayer. § 6621(d).

B

Congress has long provided tax incentives to U.S. companies to encourage export sales. At times, these incentive schemes have been in tension with the United States' obligations under international treaties. For

instance, the General Agreement on Tariffs and Trade (GATT) restricts the ability of signatory countries to directly subsidize exports.  GATT art. 16, Oct. 30, 1947, 61 Stat. A-11, 55 U.N.T.S. 194.  To avoid or end disputes over the compatibility of U.S. tax laws with this GATT export-subsidy restriction, Congress has amended its export tax incentive schemes several times.

In 1971, Congress provided special tax treatment for exports that U.S. firms sold through "domestic international sales corporation[s]" (DISCs).  *Boeing Co. v. United States*, 537 U.S. 437, 440 (2003).  These DISCs were a special type of subsidiary corporation.  *See id.* at 440 n.2.  Although not themselves taxpayers, a DISC could retain a portion of its export income and thereby defer some of its parent corporation's tax liability.  *Id.* at 440–41.  But parent corporations could not automatically assign their export profits to their DISCs.  *Id.* at 441.  The parent first had to sell its product to the DISC, which the DISC then resold to a foreign customer.  *Id.*  The profits from the export resale could then be allocated between the DISC and the parent using one of the methods authorized by the DISC statute. *Id.*

Soon after their creation, DISCs became the subject of a dispute between the U.S. and other GATT signatories over whether DISC tax benefits impermissibly subsidized parent corporation exports.  *Id.* at 442.  This prompted Congress to replace the DISC statute with a new tax incentive scheme.  As part of the Deficit Reduction Act of 1984, Pub. L. No. 98-369, 98 Stat. 494 (the FSC statute), Congress enabled U.S. companies to create special purpose vehicles called Foreign Sales Corporations (FSCs). §§ 801–05, 98 Stat. at 985.  Unlike DISCs, FSCs were foreign corporations whose income was taxable.  *Boeing*, 537 U.S. at 442.  A portion of their income, however, was tax exempt, which made it valuable for parent corporations to channel export income through FSC subsidiaries. *Id.*

Congress intended the FSC statute to create "a territorial-type system of taxation for U.S. exports designed to comply with GATT." S. Comm. on Fin., 98th Cong., Deficit Reduction Act of 1984, at 635 (Comm. Print 1984). Under GATT rules, signatory countries "need not tax income from economic processes occurring outside [their] territor[ies]." *Id.* Accordingly, Congress designed FSCs to have sufficient "foreign presence" and "economic substance" to comply with GATT rules. *Id.* at 636. To that end, the FSC statute set forth numerous prerequisites for FSC treatment. *See* I.R.C. § 924(b) (1998). An FSC must have been organized under the laws of a foreign country, maintained a foreign office with a set of permanent books of account, had a board of directors with at least one director who was not a U.S. resident, held all shareholder and board of directors meetings outside the U.S., maintained its principal bank account in a foreign country, and paid all dividends and salaries from foreign bank accounts. *Id.* § 924(b)–(d) (1998). The FSC also had to "participate[] outside the United States in the solicitation (other than advertising), the negotiation, or the making of" contracts, and show that it incurred at least 50% of the total direct costs attributable to the foreign transactions. *Id.* § 924(d)(1).

Congress and the IRS provided many ways for parent corporations to remain involved in their FSCs' operations. The FSC could satisfy the statutory prerequisites through "any other person acting under a contract with the FSC," including the FSC's parent. 26 C.F.R. § 1.924(d)-1(a). Although an FSC needed to pay the parent for this work, the payment could take the form of a reduction in the commission that the parent had agreed to pay the FSC. 26 C.F.R. § 1.925(a)-1T(b)(2)(ii). The parent could even operate the FSC's foreign office and prepare its book of accounts. *See* 26 C.F.R. §§ 1.922-1(i), 1.924(d)-1(d)(2)(i).

The FSC program lasted until 2000, when Congress repealed it after the World Trade Organization deter-

mined that the statute provided an impermissible subsidy. *See* FSC Repeal and Extraterritorial Income Exclusion Act of 2000, Pub. L. 106-519, § 2, 114 Stat. 2423, 2423; WTO Appellate Body Report, United States—Tax Treatment for "Foreign Sales Corporations," ¶ 59, WTO Doc. WT/DS108/AB/R (adopted Mar. 20, 2000).

## II

In 1984, Ford Motor Co. formed Ford Export Services B.V. (Export) as its wholly-owned subsidiary. Export then entered into an agreement with Ford to act as an FSC with respect to export transactions entered into by Ford companies. J.A. 187. Under the contract, Export assumed responsibility for export-related activities such as making contracts for the sale of Ford's exports, advertising for Ford, processing orders, arranging deliveries, and assuming credit risks associated with the sales. In exchange, Ford paid Export a commission for each sale. Both Ford and the government agree that Export satisfied all statutory prerequisites for FSC treatment.

As permitted by the FSC statute and related Treasury regulations, Ford exercised near complete control over Export's operations. Export had no employees. Instead, its day-to-day operations were administered by ABN AMRO Trust Company (Nederland) B.V., a Dutch trust company hired by Ford that operated Export in accordance with Ford's instructions. Export's board of directors consisted of Ford employees and ABN AMRO employees. Ford and Export also entered into an agreement in which Ford agreed to perform all export activities on Export's behalf. In exchange, Export agreed to pay Ford the minimum amount for these services required by the FSC statute. In sum, Export never performed any activity that Ford did not direct.

Ford's control over Export extended to Export's accounting and tax filings. Ford funded Export's foreign bank account as needed to cover administrative expenses.

When Ford made sales on Export's behalf, the purchaser paid Ford directly, after which Ford credited any owed commission in Export's accounting records. Ford even prepared Export's tax returns and paid all of Export's tax liabilities to the IRS on Export's behalf.

Between 1990 and 1998, Ford and Export filed separate tax returns using separate tax identification numbers. In 1992, Ford made an overpayment to the IRS of about $336 million. That overpayment accrued interest until the IRS refunded it in 2008. Export, in contrast, underpaid its taxes for 1990–93 and 1995–98. Those underpayments accrued interest until Ford repaid them on Export's behalf between 1999 and 2005. For the years in which these overpayments and underpayments overlapped, the IRS did not apply interest netting under § 6621(d).

In 2008, Ford filed a claim for refund and request for abatement with the IRS based, in part, on an argument that Ford and Export had been the same taxpayer between 1992 and 1998. If true, the IRS should have increased the interest rate by which it credited Ford for its 1992 overpayment, such that the interest rate equaled the rate applied to an equivalent amount of Export's underpayments. The IRS, however, disallowed Ford's claim, reasoning that the two corporations failed to satisfy § 6621(d)'s "same taxpayer" requirement. Ford sued in the U.S. Court of Federal Claims seeking to recover its claimed refund. The trial court granted the government's motion for summary judgment that Ford and Export were different taxpayers and, therefore, could not benefit from § 6621(d)'s interest netting provision. Ford now appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## III

The only issue on appeal is whether Ford and Export were the "same taxpayer" for the purpose of § 6621(d)'s interest netting provision at the time of their overpay-

ments and underpayments. The Court of Federal Claims correctly determined that they were not.

We interpreted § 6621(d)'s "same taxpayer" provision in *Wells Fargo & Co. v. United States*, 827 F.3d 1026 (Fed. Cir. 2016). There, we noted that the meaning of "same taxpayer" cannot be found in the statute's text or other parts of the Internal Revenue Code. *Id.* at 1035. Nor does the statute's legislative history offer a clear indication of its scope. *Id.* at 1036. At most, the legislative history reveals that § 6621(d) is a remedial statute designed to expand the IRS's authority to implement interest netting. *Id.* at 1038. But Congress "did not choose the term ['same taxpayer'] in a legal vacuum." *Id.* Instead, Congress legislated against a background of legal principles that shed light on which persons or entities qualify as a "same taxpayer" for § 6621(d) interest netting purposes. *Id.* Thus, to determine whether two taxpayers are the "same" under § 6621(d), we must consider whether background legal principles support treating them as such. *See id.* (treating "a background of merger law" as providing important context to determine the time at which merged entities become the "same taxpayer" under § 6621(d)).[1]

In most cases, it will be clear whether background legal principles support treating two corporate entities as the same taxpayer. To take the easiest case, there is no dispute that two separate, unrelated corporations are

---

[1] The government urges us to interpret "same taxpayer" to mean taxpayers that do not differ in "relevant essentials." Resp. Br. 21. But this interpretation adds nothing to the framework set forth in *Wells Fargo*. To determine which taxpayer characteristics are "relevant," we must consider background legal principles. To the extent the government's "relevant essentials" test differs from *Wells Fargo*'s framework, we decline to adopt it.

different taxpayers. *Id.* at 1034–35. The background legal principles that inform § 6621(d) determinations include the Internal Revenue Code and its historical application. *Id.* at 1040 (relying on "[f]ederal tax law and the IRS's treatment of the predecessor statutes to § 6621(d)" as relevant for interpreting § 6621(d)). The Supreme Court has long recognized that tax laws treat a corporation whose "purpose is the equivalent of business activity" as "a separate taxable entity." *See Moline Props. v. Comm'r,* 319 U.S. 436, 438 (1943). Because tax laws usually treat formally separate corporations as distinct taxable entities that must file their own returns, they will normally be different taxpayers under § 6621(d) as well.

Another longstanding legal principle treats parent corporations and their subsidiaries as separate taxable entities. Based on *Moline Properties'* holding that corporations with legitimate business purposes are separately taxable, we recognized that "a parent corporation and its subsidiary corporation [should] be accorded treatment as separate taxable entities." *Ocean Drilling & Expl. Co. v. United States*, 988 F.2d 1135, 1144 (Fed. Cir. 1993). This separate taxability does not depend on the degree of a subsidiary's independence from its parent. "Complete ownership of the corporation, and the control primarily dependent upon such ownership . . . are no longer of significance in determining taxability." *Nat'l Carbide Corp. v. Comm'r*, 336 U.S. 422, 429 (1949) (citing *Moline Props.*, 287 U.S. at 415).

The general principle from *Moline Properties* resolves this case. As the trial court recognized, Export engaged in substantial business activity. It contracted with Ford to manage Ford's export operations, which included negotiating contracts, assuming credit risk, and receiving commissions. Export also maintained an office, accounting records, and a bank account. This business activity renders the corporation a separate taxable entity absent an exception to *Moline Properties'* general rule. *See* 319

U.S. at 438–39. It makes no difference that Ford directed these activities because ownership and control "are no longer of significance in determining taxability," *Nat'l Carbide*, 336 U.S. at 429.

To be sure, the formal separateness of two entities will not always render the entities different taxpayers under § 6621(d). In *Wells Fargo*, we addressed the effect of a merger on whether two entities should be treated as the same taxpayer. *See* 827 F.3d at 1028–32. In one situation we considered, two companies merged after one company made an overpayment and the other made an underpayment. *Id.* at 1034. We held that, although the two companies became the same taxpayer following their merger, they were different taxpayers at the time of the overpayments and underpayments. *Id.* at 1034–35. Because "the payments were made by two separate corporations," they did not meet § 6621(d)'s "same taxpayer" requirement. *Id.* We reached a different conclusion for a situation in which a company made an overpayment, then merged with and was absorbed by a different company, after which the surviving company made an underpayment. *Id.* at 1039. In this second scenario, the acquired company and the surviving company were separate entities at the time of the acquired company's overpayment. Yet we held that they should be treated as the same taxpayer for § 6621(d) interest netting purposes. *Id.* We reasoned that merger law principles treated acquired companies as "absorbed" and surviving companies as "stepping into the shoes" of the acquired company. *Id.* at 1038–39. The merger effects "a continuation of the identity of the acquired corporation in the successor corporation." *Id.* at 1039. Thus, even though the acquired and surviving companies were formally distinct corporate entities, the unique legal effects of a merger rendered the pre-merger acquired company and the post-merger surviving company the same taxpayer. *Id.*

Ford argues that the FSC statute provides a background legal principle that displaces *Moline Properties'* general rule that parent and subsidiary corporations are different taxpayers. *See* 319 U.S. at 438–39. In its view, the statutory prerequisites for FSC treatment consisted entirely of formalistic requirements devoid of economic substance. Parent corporations could carry out all of an FSC's foreign business activity and FSCs could immediately transfer any income to their parents as dividends. Thus, Ford reasons, an FSC's underpayments or overpayments should be attributable to the parent because Congress did not intend for FSCs to operate independently.

Ford's argument fails for two reasons. First, it misunderstands what types of background legal principles support treating two entities as the same taxpayer under *Wells Fargo*'s test. In *Wells Fargo*, we based our holding that an absorbed company and a surviving company should be treated as the same taxpayer on merger law principles that directly addressed corporate identity. *See* 827 F.3d at 1039. Those principles dictated that a merger effects "a continuation of the identity of the acquired corporation in the successor corporation." *Id.* In contrast, the FSC statute never states that FSCs and their parents should be treated as sharing an identity. Rather than point to a statutory provision analogous to the merger law principles discussed in *Wells Fargo*, Ford asks us to infer that Congress intended for FSCs and their parents to be treated as the same taxpayer from FSC statute provisions and Treasury regulations that authorized parent corporations to control their FSCs. But a parent corporation's control over its subsidiary does not affect whether the two entities are separate taxpayers. *See Nat'l Carbide*, 336 U.S. at 429. For a background legal principle to displace the general rule that formally separate corporate entities are separate taxpayers, it must relate to whether two entities should be viewed as sharing an identity. Thus,

the FSC statute does not supply a background legal principle that supports treating an FSC and its parent as the same taxpayer.

Second, the FSC statute unambiguously treated FSCs and their parents as different taxpayers. The FSC statute set forth numerous prerequisites for FSC treatment designed to ensure that FSCs possessed enough "economic substance" to comply with GATT rules. S. Comm. on Fin., 98th Cong., Deficit Reduction Act of 1984, at 636 (Comm. Print 1984). It also provided that corporations that met these requirements and elected FSC treatment would be taxed differently from other domestic corporations. Unlike their parent corporations, a portion of an FSC's income was tax exempt. *Boeing*, 537 U.S. at 442. Short of an explicit statement that FSCs and their parents are different taxpayers under § 6621(d), it is difficult to imagine a clearer way for a statute to express that two entities should be treated as different taxpayers than taxing them differently. Therefore, the FSC statute's purpose and effect confirm that FSCs and their parents were different taxpayers under § 6621(d).

Ford also claims that the government's arguments in prior cases confirm that FSCs and their parents should be treated as the same taxpayer under § 6621(d). In *Abbott Laboratories v. United States* we held that the government did not err by interpreting a Treasury regulation to prohibit a parent corporation from retroactively altering the method it used to allocate income between itself and its FSC if the FSC's assessment period had expired. 573 F.3d 1327, 1329, 1333–34 (Fed. Cir. 2009). In that case, the government argued that an "FSC serves no purpose other than to enable the [parent] to claim tax benefits for income from export property." Brief for the Appellee at 40, *Abbott Labs.*, 573 F.3d 1327 (No. 09-5014), 2009 WL 870168. The government also argued that the tax liabilities of an FSC and its parent should be "made contingent upon one another," so that one entity could not request a

redetermination of its tax liability by adjusting the income allocation between the FSC and its parent if the other entity could not make an adjustment as well. *Id.* Ford contends that these statements reflect an understanding that Congress designed FSCs to provide tax incentives, not to form substantively separate entities.

We see no conflict between the government's statements in *Abbott Laboratories* and the government's position here. To start, whether an FSC and its parent should be treated as the "same taxpayer" under § 6621(d) was not at issue in that case. Moreover, the government's statements in *Abbott Laboratories* do not even implicitly conflict with its present position. In *Abbott Laboratories*, the government recognized that FSCs solely existed to provide tax benefits to parent corporations. 573 F.3d at 1331. It argued that permitting parent corporations to retroactively adjust income allocation between themselves and their FSCs without requiring FSCs to reflect the same adjustments on their own tax returns would frustrate Congress's intent. Here, the government continues to acknowledge that FSCs are artificial constructs that solely exist to secure tax benefits for parent corporations, but argues that the structure Congress chose to confer that tax benefit requires treating FSCs and their parents as different taxpayers under § 6621(d). These positions are consistent.

Last, Ford argues that, even if the FSC statute does not supply a relevant background legal principle under *Wells Fargo*'s framework, FSCs fall within an exception to the general rule that separate corporate entities are separately taxable. In *Moline Properties*, the Supreme Court acknowledged that "[a] particular legislative purpose . . . may call for the disregarding of [a] separate entity." 319 U.S. at 439. The Court cited *Munson S.S. Line v. Commissioner*, 77 F.2d 849 (2d Cir. 1935), a case in which the Second Circuit held that a parent corporation could deduct a foreign trade loss associated with a

vessel owned by one of its wholly-owned subsidiaries.  *Id.* at 852.  Although the relevant statute only permitted a ship's "owner" to claim that deduction, the court reasoned that the statute's declared purpose of "encourag[ing] the development and maintenance of an American merchant marine" supported construing "owner" broadly to encompass the parent corporation.  *Id.* at 850.  Here, Ford argues that we should similarly interpret § 6621(d)'s "same taxpayer" language to effectuate the FSC statute's purpose of encouraging exports.  Because allowing FSCs and their parents to interest net overlapping underpayments and overpayments would have further encouraged the use of FSCs, Ford contends that *Moline Properties* and *Munson* support its interpretation of "same taxpayer."

We decline to extend *Munson* to these facts.  In *Munson*, the court interpreted a statute's use of "owner" according to that statute's stated purpose.  77 F.2d at 850.  Here, in contrast, Ford asks us to interpret "same taxpayer" in § 6621(d) to effectuate the purpose of the FSC statute that Congress enacted over a decade before.  While courts often consider a statute's purpose when interpreting its terms, *Munson* never suggests that tax statutes must be interpreted to effectuate the purposes of prior, unrelated statutes.

Ford insists that courts have a duty, where possible to interpret statutes in a manner that harmonizes their objectives.  Ford bases this argument on its understanding of the interpretive canon that, "when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974).  But this canon only requires courts to refrain from interpreting statutes as implicitly repealing other statutes or rendering them inoperative when an alternative interpretation is reasonable.  *See id*; *Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*, 400 F.3d 1352, 1365, 1368 (Fed. Cir. 2005).  The canon does not

require that all statutes must be interpreted to further the purposes of all other statutes. Courts have long recognized, particularly in the tax domain, that some statutes may discourage persons from engaging in the same conduct that other statutes encourage. *See Moline Props.*, 319 U.S. at 439 ("The choice of the advantages of incorporation to do business . . . require[s] the acceptance of the tax disadvantages."). Here, treating FSCs and their parents as different taxpayers under § 6621(d) does not create any tension between § 6621(d) and the FSC statute. The FSC statute encouraged corporations to export through FSCs, even if § 6621(d) did not provide an additional interest netting benefit for that arrangement.

## IV

For the foregoing reasons, the Court of Federal Claims correctly determined that Ford and Export were not the "same taxpayer" under § 6621(d). Thus, we affirm the trial court's grant of the government's motion for summary judgment.

**AFFIRMED**

COSTS

No costs.